Good morning, may it please the court, my name is Amy Kraus and I'm here on behalf of Martha Solano. As this court is aware, Ms. Solano was driving her own vehicle across the port of entry from Nogales, Mexico to Nogales, Arizona, where she was pulled over to secondary inspection. The search happened and about 17 kilos of methamphetamine were found to be hidden in the seat backs of her car. In your brief on page 19, you say, on cross-examination, defense counsel emphasized the government's lackluster investigation. He established that fingerprint or DNA evidence was retrieved from the seat frames. Should that be not retrieved? It should, and I actually noticed that when I read the reason for Christian's plea argument, I apologized. That was a significant claim. Well, it goes to the point that, would you agree that the government might have done a lot more investigation? That's the point of your paragraph. They could have even gone to the other trailblazer and seen if there was evidence of drugs in the other trailblazer, or in this trailblazer, see if there was evidence of repeated use. There's some indication in the record of that, but they could have tested you. They could have, Your Honor, and those matters were raised to the jury, and it was a significant point of contention between the parties, and that goes to the heart of the issue in this case, which is Ms. Spano's knowledge of the drugs in her car. Now, in some ways, this was kind of a typical importation case. You know, people are driving across the border. They get stopped at the port of entry. The car gets searched, and they claim no knowledge. It's an unusual case, however, in two respects. One is that the trial was bookended by defense counsel's efforts to obtain information to corroborate the testimony of Ms. Borges. Now, this was unusual in itself because Ms. Borges actually showed up and testified that he put the drugs in the car or he assisted in getting the drugs in the car, and that the two defendants, the sisters, my client was the driver, her sister was the passenger, that they had no knowledge of this. So the jury didn't have to believe them. Correct. The jury didn't have to believe that, but they would have been more likely to believe that testimony had defense counsel been able to investigate several sources of potentially exculpatory information. I've had trouble understanding how any of that evidence could be exculpatory that you were seeking, which as I understood it was that someone reported that there was drugs smuggling that involved your client. And I'm not sure how what you wanted to know would make any difference. Well, I'd like to answer that by pointing to two things, Your Honor. First, it could have been that the evidence itself was exculpatory, and I don't really want to use the word exculpatory because I think really what we're talking about is true reality. And that, of course, is a much lower threshold, and the question is whether the evidence was helpful, could have been helpful to the defense. It could have been helpful to the defense. In two ways. One is the source of this beyond the lookout, or BOLO as it's called, who we later found out was the girlfriend, Esther Cortez, called in this BOLO because he supposedly had told her, I'm going back to my wife. So to stop him from going back to his wife to get the wife out of the picture, she calls in this BOLO, gets the wife arrested. So apparently the two of them are talking. Obviously she knows that he's planted drugs or is going to plant drugs. So if she would say, Mr. Cortez told me what he was going to do. He mentioned his wife, but he didn't mention my kindness. It won't work. If someone says, you know, Daryl is smuggling drugs, it doesn't say anything about whether Sally is also involved. It just doesn't say anything one way or the other. It's just irrelevant. Well, I disagree, Judge. I think it is relevant because the lack of information actually shows, may indicate that she was not involved. Because certainly if she was mentioned, then you would draw the opposite. I mean, the world is full of drug dealers. It's funny to learn it doesn't say anything about what other people are doing. I guess I just have trouble with the logic of it. Well, then let me answer with the second factor that I wanted to bring to your attention, which is when you talk about materiality and what could be helpful to the defense, we're talking about information not just from that source, but what can be developed from that source. And so knowing who this woman was and what she knew and who she spoke to could have allowed defense counsel to investigate further. And that's where the problem came. It's just hard to figure out. I'm having the same logic problem because they're found in the car with the drugs. So we validate who were in the car with the drugs. And it seems like the only real story was that the husband, one of them, put the drugs in the car. So the only question is whether they knew the drugs were in the car or should have known because they were willfully blind to the drugs being in the car. Right. Now, how could anyone else know that? I just don't understand how the confidential informant, whether they had Ebola, whether they had reason to hate these people or not or whatever their motive was, could ever speak to the willful blindness. It just seems impossible. So we don't know what we don't know, and that's kind of the problem in this case. And by the time we go like, yes, my husband says, like, I'm not going to tell them, and she says, he told me he wasn't going to tell them, that still doesn't tell us whether they knew. I mean, maybe they could spell it or something. But it does corroborate his testimony. And the government cross-examined Mr. Kapourkas at trial by implying that he was lying. It took him a year to come forward, so he must be lying. But even if he wasn't lying, I think the point that Judge Friedland is making, I think is getting at it is the same thing that I guess bothers me about the materiality of the issue. And that is, this was tried on a theory of willful blindness. There was not an effort really made to demonstrate that they actually knew. But there was plenty of testimony that, for example, the seats were so stuffed full that they were just insanely uncomfortable or that anyone would have known that there was something going on and there were all these identical, what were they, blazers or something, all these identical vehicles and comings and goings with the vehicles while they were looking back in half an hour with the car and several border crossings and so forth. So there was plenty of evidence to support the willful blindness. And I just don't see how anything else is wrong. So you're correct, obviously. The only issue that was in dispute was knowledge. And I vehemently disagree with your characterization, Judge Brewer, that this case was tried on deliberate ignorance. It was tried as an actual knowledge case. And everything the government said in support of its deliberate, advocating for the deliberate ignorance instruction was the same evidence that they argued for actual knowledge. And, Judge Brewer, just because they were wrong about one doesn't mean they're wrong about the other. But they were in this case, Judge, and the reason they were is because in order to get the instruction, you have to first assume that the jury has rejected evidence of actual knowledge. And when you do that, in this case, there's nothing left. They either knew or they didn't know. There was no evidence on which deliberate ignorance was used. Well, there's plenty of circumstantial evidence. If I get in a car there where I can barely sit in the seats because it's so uncomfortable, and there are all of these comings and goings of a bunch of weirdly identical vehicles, I think that is circumstantial evidence from which someone can infer deliberate indifference. I don't want to know. Don't tell me what's in here. I don't want to know. Judge, if you look at the cases where deliberate ignorance instructions were approved, I think they're very different. Those are cases where, for example, and I'm going to run out of time, and I'd really like to save some for rebuttal, but I'd like to answer this question because I think it's an important issue. If, for example, in the E case, the man walks through, he doesn't walk through and he's buying an apartment complex, and he says, you know, asbestos might be a problem here because of the age of the building. And then he gets reports that say there are asbestos, and he doesn't read them. There's the Rama Zatondo case where the man is in a pango boat with six packages. He's told to dress in dark clothing, go at night, don't bring your ID, and he doesn't ask what's there. There's no evidence of that in this case. It was all an actual knowledge case, and the government's argument that they knew or should have known, and Judge Friedland, you repeated that phrase, I believe that was erroneous. That reduced the government's burden of proof, and that's why these convictions must be served. How do you distinguish this case, though, from your instance versus your ready, or unbucked decision? It seems like there it was, maybe they knew about the drugs, or maybe they shouldn't have had this. Well, to one, isn't the instructions we set were proper? So I don't understand how this is any different. Well, Judge Graber didn't find those instructions proper, but we all know that. That doesn't actually matter. No, it doesn't. It doesn't matter. In that case, the defendant testified. She testified that she actually suspected there might be drugs in the car, but she just didn't have enough time to pull over before the checkpoint. That is very different than what happened in this case, and I am out of time. You may have a minute for a follow-up. Thank you. We'll hear from Dr. Beers and Cameron. Good morning. May it please the Court, my name is Ryan D. Joe. I represent the United States Attorney's Office for the District of Arizona. So in what your Honors were just speaking about, in this Ramos-Sotondo case, it makes it clear how the tool of instruction, the deliberate instruction, gets into a case. As everyone argued, this is the prime example of a factual scenario where the deliberate ignorance instruction is appropriate. Ramos-Sotondo said itself that the theory of deliberate ignorance need not be exclusive. It may be an argument to alternative knowledge. And just like it was alluded to in her rating, this alternative knowledge comes from either proving knowledge or proving that the facts as existed. The knowledge is impugned because these people did not actively investigate where they should have because they didn't want to know the answer. So that's where the deliberate ignorance instruction comes in. And Ramos-Sotondo goes further and says, no established principle of law declares that deliberate ignorance instruction cannot be given unless deliberate ignorance is the main thrust of the government's case which needs more enclosing argument. That's a direct quote from the Ramos-Sotondo case in terms of the deliberate ignorance argument. And I think as the court sits here, it knows more than the defendant because the court has reviewed the in-camera materials that were submitted to the district court and to the magistrate court at the outset from the government. So again, I think the panel's points are well taken as to the defendant's lack of a link to a exculpatory material or material things that they could investigate because the court is in a better situation to review that based on the in-camera material. Why should the district court have interviewed this bolo source, though, Just to make sure that there wasn't more that could be obtained from an interview or an in-person questioning than was written down in the file. Is this in the new trial context or? In the new trial context. So in the new trial context, this person who's interviewed, I think because of the in-camera materials, they already have a sense of what this person's going to say or what this person's testimony or perceived testimony could lead to. And that led the court not to go forward and say, Okay, this person needs to come in, or we need to have an evidence hearing as part of this new trial procedure to see what this person would say. I think it was established in the in-camera materials what this person brought to the table, and there's really no need for any further specific hearing to bring this person in, have them see the light of day, have the defendant actually know for sure who it is, have the public actually know for sure who it is. I just think some of the balancing factors that come from the pre-trial are at play there. I'm troubled a bit by the R&R submitted by the magistrate judge. That R&R says, The source did not have direct contact with the defendant during the alleged criminal conduct and is therefore unable to exculpate her of the charges. I think of a lot of situations where exculpation could come, even if the defendant did not have direct contact. Like the source could have said, I saw them picking. They picked it hard. They took out the phone. It looked like it had been done lots of times. It seems to me the source could have provided a helpful testimony to the defense, even given the limitation expressed in the R&R. I don't believe that to be the case because, again, when you fast forward to the ending here, it's the defendants getting into the vehicle right before they cross into the United States when the seats are finally hard. They're different than they were when they drove in. So the manner in which they were placed, the manner in which that someone might have seen the vehicle to be loaded, the manner in which someone might have seen other people that were not the defendants involved in loading, none of that is relevant to the issues at hand, to the jury in the issue of the case, which was the defendant's knowledge. It all hinged on the defendant's knowledge. So all the mechanisms that put the trucks in that vehicle to the point in which the defendants get into it before they go back into the United States and actually feel the hardness, the lack of the foam, the things that your honor was speaking to, are really not relevant to the issues at hand to the jury and therefore do not exculpate the defendant. Can you tell us, without revealing any confidentiality, why the government needed to protect the source? There was a rather poor answer, I thought, below as to why the government felt the source should be protected. It just seems like there's a record now as to whether the source should be protected, particularly in comparison to the benefit that might have provided to the defendant. It's because of the general nature of protecting sources, which was cited, which might seem a little bit of a flimsy. She's saying all sources should be protected, and I think that is important. People should be able to freely come forward to give information on criminal enterprises. I think the very factual determination here is this is a border case. You don't know what's going on in Mexico. There's no ability for American law enforcement to protect someone who can cross in and out of Mexico, which this source was able to do. So I think it's highly unknown as to why these protections need to be in place and why the government needs to fight hard to ensure that people can come forward to this kind of knowledge. Maybe the specifics of this case are different because it is in this playing way this is Mistress, who it turns out to be is the Bolo source, but again, that's not revealed until after the trial when the new trial motion is actually filed to say, okay, now we know who this is. Now the defense knows who this is, even though the government knew who it was. And I think what's important about the source itself is that knowing what the court knows, the in-camera materials, there was no mention of that sentence. There was mention of two vehicles that could potentially have drugs coming into the United States between August 24th and August 26th. That was the information, not about people, about vehicles. Now there was mention of some people that could have been in the vehicles, but again, that information was crossed. It was these potential people could be in this vehicle, these potential people could be in this vehicle, and that's how it turned out. The information given to who could be in the other vehicle not knowing turned out to be similar to the information of the people, the defendants, who were actually in the trailblazer when it was caught. And is there no more questions on any of the issues? You've been done? You've used all your time. No, but you can have a mandatory medal. But try. So we left off with the Heredia case. And in that en banc decision, this court held that to deliberately avoid learning the truth means something that is intentional, premeditated, fully considered. That is not to say it should have known. Mr. Kehoe argued in his rebuttal closing that he said the issue in this case is whether they knew or whether they should have known and should have investigated. Did he bring up a prosecuting bill for that? I have an argument that that was misconduct, though, on the prosecutor's part. You only challenged the instruction. So I wondered if you were hinting at that, but I didn't see a separate claim to that effect. I did not raise a separate question. And that was a standard instruction that the arguments of counsel are not evidence and that only the court issues the instructions. And the instruction was the model instruction. That's correct, Judge. But that didn't change the decision in Lugo where a prosecutor made a very similar argument in a drug case in rebuttal where this court held that by arguing in rebuttal the last thing that the jury hears that defendants are serial drug traffickers where, like here, there's no evidence of prior drug trafficking. That that was prosecution putting their thumb on the scale of justice, and that was improper. So I think this court can reach that question regardless of the manner in which it was raised and based on the components. Thank you, counsel. Thank you. And I'm going to move on now to Judge Porteous. And here's my argument. Please do. Yes. Thank you. Great. Of course, many of the arguments we've just discussed apply to you, so feel free to address them. My name is Cory Matheson. For people like Brenda, I'm a nosy porteous. And as counsel has done a good job in articulating those issues, I'm going to talk about really the main issue of my appeal versus the denial of motion for substitution of counsel. Here's just before you get there. Yes, sir. Is it the argument of the author, any defense counsel, that it would be improper to have alternative theories from the government on the issue of the obstructions? Can there be alternative theories? At times it seems the defense will say you have to pick one. Well, they do appear as if you have to pick one. Even if you're susceptible to a factual analysis, the jury might go one way or might go the other way. I know you're saying that times from here they'll go one way, absolute knowledge, but can't there be an alternative theory? No, I think the jury's assertion should be given if it is informed by the facts. And I don't think it could be more articulated than it was in this particular case. You know, obviously we have the lawsuits, and there's this compelling way. I think it gives us a good framework of what we need to look at in this particular case. A couple points of history about the attorney-client relationship here. For the record, what we know is that the client and the attorney may have been in court maybe twice together. They were there once in October. Newton-Mentos had divergent colitis. She was in the hospital for a couple of days. What we know about the request, this is her first request. There were multiple calls before this. It was done on her work stationery. She was working two jobs. She employed her kids. Obviously she was out of custody at that point. Her sister was out of custody, and the principal was her witness. This gentleman, who himself is a veteran of the quarter, said he could testify on behalf of these two women and say that really they had nothing to do with it, and he was responsible. The issue about the inquiry, excuse me, the inquiry done by a district court judge, from a third-rate perspective, it's our position that procedurally that a vote in evidentiary hearing was not done appropriately. There was a preference for these types of hearings to be done in private. We know that it wasn't, and that the way that the hearing began was the district court judge allowed. Is that an argument you made in your brief that it should have been in private and it wasn't at a room number? No, and maybe not specifically, but certainly I addressed the procedure of the hearing itself. You need to hear what the court said was what the judge had before her, an appropriate document, and they get in court, and it's the defense lawyer, quite flexibly. And the way that the court begins is they say, they don't query the defendant about why do you want a judge or lawyer, what's going on. What they say is the defense attorney make an opening statement, and he does. And he makes an opening statement for a long period of time discussing really the relationship between he and his client and the fear of the defendant. And in this particular case, he's still open to court. We know that. Since we're after your little response on her work stationery, she employs a defensive possible lawyer. She has to now respond to her lawyer, who apparently has 33 years of experience. You know, I think that, in general, that environment was created in the immediate stuff. We don't have a defendant who's verbose in her law skills, who's lived in college, who has a piece or account, who's articulating and creating her own record about the problem between her and her lawyer. We have a little mom with two kids who the hearing is commenced with. Does that lawyer talk about what's going on here? But, I mean, so what your client had said was, I'm not communicating. I don't trust my communications with my lawyer. And then the judge asked about that and asked both sides what kinds of communications when you discuss the issues. And it seems like the answers were that they had been discussing them, and it wasn't really – I feel like it's unclear to me what the judge should have done. I hear you that you wish it would have been in a different order, but are there questions you think should have been asked about the actual complaint she was making that weren't asked? Well, I think one of the things the district court should do in the findings of the lawsuits, of course, is the court has to have sufficient information so they can make the decision. And secondly, they have to have specific questions. So if we're talking about communication and the breakdown of communication, so we've been figuring out, have you met? What is the frequency of your meeting? What is the mode of communication? Are you meeting in person or are you meeting by telephone? To get an idea of what the communication is actually happening. But what we get is – It appeared to me from – maybe this is just a new interpretive overload, but it appeared to me that the complaint that your client had was primarily my employer keeps bringing me bad news about the case and wants to argue that I didn't know about the drugs. And I don't want to hear bad news, but I guess I have difficulty seeing that there was an absence of communication as opposed to her complaining that she didn't like the content of the advice, which is kind of a different question. I think that we don't have a record really on that because, again, if you look at what's happening with this communication, we know that she's not questioned privately. And we know that she is asked questions eventually after her lawyer. But what the defense counsel says is he says, I'm ready to go to trial. My client is not – she has a problem. Someone is putting things in my client's head. Someone is doing damage to my client. And all of these remarks come in the opening statement. And then after there's some quality between the judge and the defendant, and I think most of those we can characterize as – just query after query about the plea agreement between the judge and the lawyer as you communicate the plea agreement. Do you feel she understood it? Second question, was it no intelligent, voluntary waiver for her not to take the offer? Explain to her that she doesn't have to take an offer. And then we have this whole concept of putting things in people's heads. And then the final argument is, again, about her problems. She has problems. So, you know, to me, if you characterize these statements, it's really he's blaming his client. He's insinuating some sort of third-party interference. And he even mentions a question of trust on page 14 of the transcript. So those things to me radiate to a breakdown of communication. And in the court, you know, one of the issues or, you know, one of the issues that are going to come up is the timing of this issue. And I think the law space, again, is important, because we're balancing the inconvenience of getting new lawyers and continuances against perceived better right by the lawyer. And if you look at the inquiry, and I believe, again, I don't think the court asked specific points of questions to make a determination about the communication. It did ask, though, when she started having this concern, and she said she had it from the beginning. And that gives no explanation of why she didn't raise the concern earlier. Right. And my guess is that there was a disclosure in the case. There's 404B material in reference to the other vehicles and what's going on. And the defense counsel says, well, I have these new things, and I need answers from her, and I'm not getting them. I think that probably precipitated some kind of attempt at contact between defense counsel and the client. The client's like, well, you know, what's going on? Because we have not been communicating. But on the issue of time, that's where the concerns are going to come up. You know, again, both defendants were out of custody. Material witness had been there voluntarily. Obviously, the material witness procedures can be used to bring him back. And if we look at the balance of things, our position is, one, that it's not untimely, because we know there's no great line rule about timeliness. We know that D.M. Morris said that 10 days even was okay. And then, secondly, that even if there was a timeliness issue, that, again, in balancing it using the holding and Velazquez, that failure to conduct the hearing adequately, combined with the breakdown, would not weigh any of the timeliness issue. Thank you, and good morning again. And speaking about the Velazquez case first that recently came out, I think that is a night and day contrast to how the substitutes or counselors went in this case. In Velazquez, you had frequent, pervasive, consistent concerns from a defendant. In this case, you did not. It was one letter. It was addressed in an actual hearing. That was, the court was clear. It was defense counsel, the defendant, and the court. Velazquez, there were several motions. That's something that is to the discretion of the district court. And I think when you're having everyone else already cleared out, and you're talking about a motion to substitute counsel, the cards have to be put at the table, so to speak. And so even though the defense counsel gives kind of an opening statement as it was characterized by opposing counsel, that's necessary. You need to know both sides. You need to know with candor what they're thinking, what the issues are, because the questions have to be specific and targeted. Well, oftentimes defense counsel is not a good source of information because they appropriately don't want to speak against their client. Well, again, I think this goes back to the abusive discretion standard, which this court will address the issue in that the district court has the ability to know the attorneys that are practicing their response to what they're hearing from the attorneys, but also take it in context with what they're hearing from defense counsel. And when you're talking about deep-seated communication with the relationship, I think it's important to see their interaction with each other. I mean, to separate them is to really take the disadvantage to see how they interact, how they answer each other's questions, even if there is to be some kind of verbal conversation between all three of them, or if there are disagreements for both parties to hear those disagreements so that the court can understand the nature of any problems that might persist in their relationship. So, again, going back to Velazquez, in Velazquez you had really an initial hearing off of that defendant's concerns that was really very much brushed aside. And then there was another written letter from that defendant in that case, which was dismissed without a hearing. It was moved after that defendant actually pled. So that's not the case here. And if the court can remember the chronology here, there was a trial date that was set up. Ms. Mendoza, the court, has had health problems. There was discussion on the record about a motion to continue there and about some of the disclosure and the tightness issue that an opposing counsel brought out. And the case was actually continued a month from November to December. That actually expired in December. And then this hearing came up where you can actually hear the targeted questions. If you look at our brief on page 14 and our supplemental excerpt of the record from pages 16 and 17, the court asked targeted questions. It asked the defendant what she meant, what she didn't understand, much of what she talked about. The defendant stated she doesn't hear anything positive, and I think that alluded to the court. It's not so much a problem with the attorney, it's a problem with the case. If you remember the facts, the defendant's husband agreed to come, go into custody, testify, and actually testified it was all him and not the defendant. So there were obvious things that were brought and presented in terms of a defense in this case, because it was presented as a joint defense. And so going further on page 14 of our brief, the district court stated that the trial counsel receives reports from the government, and the counsel obviously communicates this with you, and the defendant replies correct. Every time he receives something, he tells me about it, and the defendant acknowledges she looks over the materials. So the timeliness issue of the materials really does not factor on this decision as much as the opposing counsel hopes it will, because, again, it was stated in that hearing that to the defense counsel, these items that are being disclosed, they're not a surprise, and it was acknowledged, no, it's not a surprise. So it's not as if it was brand-new content. It might have been in a different form, or it might have been in a different presentation, or it might have even been certified documents or documents that were given uncertified earlier in the case. So I think when you take this case and put it up against Alaska, especially with an abuse of discretion standard, not only is it not an abuse of discretion, it's really an exercise of how things should proceed and how things should not proceed, and I think this is a prime example of how things should proceed. I think the court did a very thorough job of going through to determine that it would be more of a problem in the case, and that's what's in communication with the attorney. Sir, do you have any sense that the defendant had any ulterior motives other than a simple feeling that she wasn't communicating and wasn't getting along with her attorney? Well, I wouldn't characterize it as cold feet. And again, just from seeing from the record, obviously, the court's inquiry and the court's kind of perception of the actual mood in the courtroom when it's just them would be more controlling. But with the defendant's health problems that were exacerbated by the stress of the impending trial and the month continuance where it had been exacerbating more, I don't think there's ulterior motives. I think it was just cold feet and it was really just not liking the case as it stood when it went to trial. And if there are no other questions on any other issues, I hope this has been a good assignment. You may do that. And Mr. Davidson, do you have something to follow up on? You know, if you listen to the government's argument, a judge would never meet a defendant in private. That's what they said. They said this is the way you should be done every time. And that just flies in the face of what Pulaski says with some of the premises. Remember, motions for new counsel come in different ways. This is not from the lawyer. And we've all done those with lawyers where you have a problem with a client or something's happening and you feel inclined to do it. And then it's your motion. You stand before the court and you argue your motion. This is coming from the client. We've never done this before. It's your first time asking for a lawyer. Unlike Pulaski, you know, unlike some of the cases said by the government, I believe Roosten and Roosten, in their brief, some of them had three or four lawyers before. This is her first time. It's her motion. The most appropriate thing to do is to listen to her, listen to her in private, and find out what the communication was. And this is what's been done. Thank you, Counsel. The case just started. It is submitted. And we thank all three of you for very helpful arguments in these combined cases. Just as a reminder, we will charge and confer privately, but we will be back after them to talk with the students and faculty who remain and any other members of the court family or the public who wish to stay here are most welcome to be here as well. So with that, we'll be adjourned.
judges: Graber, Friedland, Guilford